UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BONNIE DANK
5404 Columbia Road
No. 928
Columbia, MD 21044
    Plaintiff,
v.                                                                                     C. A. No. __ ____
R. JAMES NICHOLSON,
    Secretary
DEPARTMENT OF VETERANS AFFAIRS        JURY TRIAL REQUESTED
810 Vermont Avenue, N.W.
Washington, D.C. 20420
    Defendant.
_____/

## VERIFIED COMPLAINT OF DISCRIMINATION UNDER THE AMERICANS WITH DISABILITIES ACT, THE REHABILITATION ACT OF 1973, AND TITLE VII OF THE CIVIL RIGHTS ACT

I. INTRODUCTION: Parties, Jurisdiction and Venue

1. This case involves an employer's intentional discrimination on the basis of Plaintiff's disability and gender, failure to accommodate her disability, and retaliation against Plaintiff on account of her making charges against agents of the employer and exercising her right to seek such accommodation. It asserts violations of Section 504 of the Rehabilitation Act of 1973 as amended ("Rehabilitation Act'), 29 U.S.C. § 794, the employment provisions of the Americans With Disabilities Act (ADA), 42 U.S.C. §§ 12111, 12203 *et seq.*, 42 U.S.C. §§ 2000e-2 and 3 *et seq.*, (Title VII of the Civil Rights Act of 1964 and 1991), and the provisions of the Civil Service Reform Act of 1978, 5 U.S.C. § 2302(a) and (b)(1)(A) and (D) and (b)(9).

2. Plaintiff Bonnie Dank is a resident of the State of Maryland. She was, at the time of the complained of events, a psychiatric nurse practitioner at the Department of Veterans Affairs Medical Center ("VAMC") located in Baltimore, Maryland. Ms. Dank is a female and an honorably discharged veteran of the Army. She was forced to leave military service as a result of a number of service-connected disabilities, chiefly, multiple sclerosis. She subsequently began employment with the VAMC.

3. R. James Nicholson is the chief executive officer of the Department of Veterans Affairs, a federal executive agency and an employer subject to the requirements of the Rehabilitation Act, 29 U.S.C. §§ 794(a), the Civil Rights Acts of 1964 and 1991, 42 U.S.C. § 2000e-16(a), and the provisions of the Civil Service Reform Act of 1978, 5 U.S.C. § 2302(a), (b)(1)(A) and (D), (b)(9) and 5 U.S.C. § 7702.

4. This court has jurisdiction under 28 U.S.C. § 1331, 42 U.S.C.§ 12117(a), 42 U.S.C. § 2000e-5(f)(3) and 29 U.S.C. § 794a(a)(1). Venue is proper under 28 U.S.C. § 1391(a). The plaintiff has exhausted the administrative agency process pursuant to 29 U.S. C. § 1614.407(c).

## II. THE FACTS

5. The Plaintiff was diagnosed with multiple sclerosis in 1982 during her military service with the Department of the Army. She was honorably discharged in 1985. At the time of her discharge, she was rated, for purposes of veterans' benefits, with an 80% service disability.

6. Since her discharge from the Army, the Plaintiff has been at school and/or employed in the area of nursing, specifically, in the area of mental health. She is a Registered Nurse licensed by the State of Maryland and the Drug Enforcement Agency to dispense controlled substances. She received a bachelor's degree in nursing from the Catholic University of

America, Washington, D.C., in 1988; a Master's degree in Public Health in 1981 from the Johns Hopkins School of Hygiene and Public Health; and a Master's degree in Science (psychiatric/mental health nursing) from the University of Maryland in December 1999. She received the additional accreditation as an Adult Nurse Practitioner from the University of Maryland in May 2000. She is certified by the American Nurses Credentialing Center as a Clinical Specialist in Adult Psychiatric and Mental Health and as an Adult Nurse Practitioner. She has been employed as a clinical nurse or clinical psychiatric nurse with a number of employers since her discharge from the Army.

7. On or about January 12, 2003, the Plaintiff began employment with the defendant as a psychiatric nurse practitioner at the Baltimore Veterans Affairs Medical Center ("VAMC").

8. The position for which Plaintiff was hired required her to function as a "licensed independent practitioner" (as defined by the Department of Veterans Affairs) at hospital-and-community-based VA facilities. In that position, she was responsible for performing comprehensive mental health assessments of VA patients, ordering and interpreting diagnostic tests, prescribing pharmacologic and non-pharmacologic treatment for the management of acute and chronic illness and disease of veterans of military service, and collaborating with other members of the health care community at the VA. Her position required her to meet with some 12-15 patients a day in appointments that lasted up to 60 minutes each, in an outpatient setting. At the Baltimore Rehabilitation and Extended Care setting, an in-patient setting, she followed between 5 to 15 patients at any one time requiring ongoing collaboration with the physicians and nurse practitioner.

9. At all relevant times, Plaintiff was able to perform all the essential functions of her

position.

10. Psychiatric nurse practitioners could be and were, at all times relevant, assigned to either the Baltimore VAMC itself or any one or more satellite locations in the State of Maryland administered from the Baltimore VAMC. These locations included Perry Point, the Baltimore Rehabilitation and Extended Care Center at Loch Raven Boulevard, Baltimore, which operated both inpatient and outpatient clinics; and seven community-based outpatient clinics located at Cambridge, Fort Howard, Pocomoke City, Loch Raven (Baltimore), Glen Burnie, Perry Point, McVets (Baltimore) and Green Street (Baltimore). Each of these locations involved varying traveling times. Under ordinary circumstances, Fort Howard involved 30 minutes traveling time from the Baltimore VAMC. The Baltimore Rehabilitation and Extended Care Center ("BRECC") involved an approximate 10 minute driving time from the Baltimore VAMC. Loch Raven and Glen Burnie were both within 30 minutes traveling time of the Baltimore VAMC. Perry Point involved an approximate traveling time of 60 to 90 minutes to or from the Baltimore VAMC. Charlotte Hall required a traveling time of approximately 90 minutes to or from the Baltimore VAMC. The Cambridge assignment required the longest traveling time of two hours to or from the Baltimore VAMC.

11. Along with other nurse practitioners hired at the time, Plaintiff was given her initial assignment sometime on or about January 15, 2003. The plaintiff was only initially assigned as a nurse practitioner outpatient clinics at Baltimore VAMC at Charlotte Hall for two days a week, Glen Burnie for two days a week, and the Loch Raven outpatient clinic for one day a week.

12. During all relevant times, plaintiff's direct supervisor for rating and administrative purposes was Ron Hopper. At all relevant times, Mr. Hopper was a Nurse Executive. In January

4

2003, at or around the time plaintiff received her initial assignments, she informed Mr. Hopper, that she had multiple sclerosis. She expressed concern to Mr. Hopper over the amount of traveling time to the Charlotte Hall facility and that such traveling would aggravate her medical condition. Subsequently, before beginning her on-site assignment to the Charlotte Hall facility, her initial assignment was changed to Cambridge.

13. However, it was at the Glen Burnie outpatient clinic that the plaintiff first experienced difficulties arising out of her medical condition and the defendant's failure to reasonably accommodate her.

14. The plaintiff was assigned an office at the Glen Burnie clinc that was located at the back of the clinic and quite a distance from the clinic's entrance. In order to get to her office, she and the patients she was seeing, were required to walk out of the reception area, down a hallway, past an office, the pharmacy, the laboratory, four (4) nurses' offices, six (6) examination rooms, the rest rooms and the staff lounge, through a door, another hallway and another door into a second set of offices. This involved walking a distance of 200 to 225 feet from the plaintiff's office to the clinic's reception area roundtrip.

15. While other medical practitioners at the Glen Burnie facility were notified by telephone by the reception clerks when their patients arrived, the plaintiff was not.

16. Shortly after beginning to work at the Glen Burnie facility, because of the repeated walk to meet her patients at the clinic's waiting room tired her and cut into her actual time meeting with patients, the plaintiff requested to be notified by the clinic's clerks when her patients arrived. The plaintiff's initial informal request for such notification was refused by Ms. Trish Vicari, the clinic manager.

17. Beginning in the late spring of 2003, certain symptoms accompanying the plaintiff's multiple sclerosis worsened. Specifically, the repeated walking in the Glen Burnie clinic from her office to the reception desk aggravated her already limited ability to walk and was quite tiring to her. Likewise, the two-hour driving time each way to the Cambridge facility was causing her to become fatigued.

18. Accordingly, the plaintiff again requested, first to Ms. Vicari, and then, on June 20, to Robin Hindsman, the Coordinator of the Mental Health Outreach clinics under the Baltimore VAMC, that she be accommodated by having the clinic receptionists notify her when her patients arrived and that she not be required to meet them at the clinic reception room. She sent copies of that request to Patricia Vicari, the clinic manager, and to Ron Hopper, plaintiff's supervisor.

19. On June 23, 2003, the plaintiff was told by Ms. Vicari that she could call the reception area to find out when her next patient had arrived. After some period of time, the staff in the reception area began the practice of calling plaintiff on their own to inform her of her patients' arrival and relieve her of making repeated inquiries as to the arrival of her next patient.

20. On or about September 2003, because driving four-hour round trip to the Cambridge facility was aggravating her multiple sclerosis symptoms, the plaintiff approached one of the other psychiatric nurse practitioners, Andrew Goldberger, who had started employment at the VA after she had begun employment there, to ask if he would be willing to go to Cambridge in her place so that she could avoid the four-hour round trip traveling time. Mr. Goldberger refused her request to change assignments.

21. Subsequently, in September 2003, the plaintiff approached the new Acting Director

for all Baltimore VAMC outpatient mental health clinics, Allan Etty. She informed Mr. Etty that the drive to and from Cambridge twice a week was having a debilitating effect on her health and that she needed to be accommodated. Mr. Etty told her that at the end of October, when the Charlotte Hall facility was scheduled to be transferred from the Baltimore VAMC to the jurisdiction of the Washington, D.C. VAMC, Mr. Goldberger would no longer be traveling to Charlotte Hall and could be reassigned to the Cambridge clinic for one day a week. The plaintiff agreed to continue to go to Cambridge until then, but told Mr. Etty that, because of her disability, she did not think she would be able to do so beyond October.

22. Subsequent to the plaintiff's conversation with Mr. Etty, the plaintiff again approached Mr. Goldberger about taking over the assignment to the Cambridge facility. Mr. Goldberger again indicated that he did not want to switch assignments and service the Cambridge clinic. He stated that he would not take over the Cambridge clinic assignment because it was too long of a drive. He cited his desire to remain at a closer distance to his home to attend to his young child when the child came home from school.

23. In late October, still assigned to the Cambridge clinic, the plaintiff wrote an e-mail to Mr. Etty reminding him of their earlier conversation regarding reassignment. Mr. Etty responded that he did not recall the conversation and that she would have to file a formal request for reasonable accommodation.

24. In early November 2003, the defendant sent the plaintiff a letter requesting that she submit a letter from her physician that she was a qualified disabled individual under the Americans With Disabilities and Rehabilitation Acts. She was directed to provide the agency with extensive medical documentation pursuant to 5 C.F.R. § 339.104. The defendant's

directions to provide such information was not consistent with 29 C.F.R. 1613.701 et seq. as required by 5 C.F.R. Part 339.

25. On or about November 17, 2003, the plaintiff fell asleep at the wheel driving back from the Cambridge facility. Her treating neurologist Dr. Rene Pazdan informed her that she should no longer make the drive to and from Cambridge.

26. On or about November 19, 2003, the plaintiff provided the defendant with written documentation from Dr. Pazdan. Dr. Pazdan's letter confirmed that the plaintiff suffered from multiple sclerosis and secondary spasms as a result of that disease. Dr. Pazdan also wrote that the defendant should contact Dr. Pazdan if it had any further questions or concerns and Dr. Pazdan provided her telephone number.

27. On or around November 24, 2003, the plaintiff informed Mr. Etty as well as Mr. Hopper and other supervisory personnel that she had fallen asleep at the wheel on the return trip from Cambridge and had driven off the road. The plaintiff advised that her neurologist had instructed her not to drive out to Cambridge. She suggested various arrangements that could be made to accommodate her medical condition and her patients.

28. On November 24, 2003, Georgia Galicki, RN, another management official whom the plaintiff had never met in person, but who, the plaintiff believed, reported directly to Ron Hopper and who was working at the Perry Point facility, and Allan Etty, informed the plaintiff that she needed to have her physician complete "[a]ll the paperwork regarding your accommodation" prior to accommodation being granted." Allan Etty responded to plaintiff's request for accommodation with an e-mail stating that the plaintiff "just can't quit going" to her Cambridge assignment.

8

29. Neither Galicki, Etty, Hopper, nor any of defendant's agents, called Dr. Pazdan, the plaintiff's neurologist, as the neurologist had requested.

30. In response, the plaintiff informed Ms. Galicki and Mr. Etty that she would go to Cambridge again, against the advice of her physician, but requested that a driver be provided.

31. Not until after plaintiff's additional complaints was Mr. Goldberger reassigned from Charlotte Hall to VAMC sites in Baltimore.

32. On or around December 3, 2003, the plaintiff was provided a temporary reassignment from Cambridge to the Baltimore Rehabilitation and Extended Care Facility ("BRECC"). The plaintiff continued to work at the Glen Burnie CBOC. Mr. Goldberger was assigned to the Cambridge facility for one day a week.

33. Subsequent to the plaintiff requesting that she be notified of patients' arrival by clinic staff at the Glenn Burnie clinic and her seeking to be reassigned from Cambridge to a facility closer to Baltimore in order to accommodate her disability, various managers of the defendant, including Ron Hopper, Alan Etty, Patricia Vicari, and Georgia Galicki, began harassing the plaintiff. They did so by casting aspersions on her truthfulness with regard to her medical condition; stating or implying that she was not qualified for the position of psychiatric nurse practitioner and that she had wrongfully failed to inform the defendant at the time of her appointment of her disability. They also began to criticize her performance alleging that she was not a "team player" and had "poor interpersonal skills."

34. Subsequent to her formal requests for reasonable accommodation of her disability, plaintiff's direct supervisor, Ronald Hopper, began selectively soliciting information on Plaintiff's performance and interpersonal skills. In response to his request, Mr. Etty wrote:

She sends too many emails thinking the world revolves around her. She pulled that deal of leaving Cambridge without providing adequate documentation of her disability which I am still not sure is really disabling to her ability to get to work. (Goldberger had to suck [sp} up her responsibility.)

35. Mr. Etty did not solicit any feedback in this regard from Dr. John Butchart, Dr. David Loreck, or Dr. Frederick Knowles III, all of whom had worked with the plaintiff as collaborating psychiatrists from January 2003 onward.

36. On or around January 29, 2004, Mr. Hopper, once again requested extensive written documentation of the plaintiff's medical condition and her need for accommodation. The plaintiff objected to the defendant's request for documentation as overly intrusive and not relevant.

37. On or about February 19, 2004, the plaintiff's neurologist provided Mr. Hopper with a more detailed written response regarding the plaintiff's medical condition and the manner in which the plaintiff could be accommodated. The neurologist specifically reviewed the plaintiff's job description. She also informed Mr. Hopper that the plaintiff was capable of performing the duties of her position of Psychiatric Nurse as long as such accommodation was provided.

38. On February 27, 2004, Mr. Hopper provided Plaintiff with a satisfactory proficiency report for the period of January 1, 2003 to January 12, 2004. Although he remarked in two subcategories of the "Interpersonal Relations" Performance standard that the plaintiff "needs improvement" and made some limited critical remarks of plaintiff in the narrative evaluation, he set goals for the plaintiff's next rating period and determined overall that she met her Performance Standards. In neither subcategory in which he offered specific remarks, did he indicate that the plaintiff had not met the satisfactory standard of performance.

39. During the annual proficiency period preceding this report, despite several requests

of the plaintiff that Mr. Hopper meet with her on the one day a week that she was in the Baltimore vicinity, Mr. Hopper had met with her on only two occasions.

40. As a result of her satisfactory performance rating, the plaintiff continued her employment.

41. On or around March 23, 2004, the plaintiff received notification of the defendant's approval for reasonable accommodation.

42. On or around March 31, 2004, without further discussion with the plaintiff, Mr. Hopper requested that a Summary Review Board be convened by the VAMHCS. He indicated that the plaintiff's interpersonal skills were not appropriate to her grade and functional statement and recommended her termination.

43. The plaintiff was informed that the Board would hold an "impartial review" and that Plaintiff could provide documentation to the Board. A Nurse Professional Standard Board ("NSPB" or "Summary Review Board") met on or about May 14, 2004 to review plaintiff's performance and alleged deficiencies in interpersonal relationships.

44. In its review, the NSPB relied heavily upon Mr. Hopper's report of the alleged deficiencies in plaintiff's interpersonal relationships with other staff that he had selectively solicited. It failed to consider favorable information forwarded to it by the plaintiff or others. The NSPB failed to conduct any independent investigation or inquiry into the plaintiff's performance. It failed to follow other governing regulatory procedures. It also included management personnel who, by regulation, were not permitted to participate in the independent board process. As a result of its review, the NPSB recommended to Dennis Smith, the Director, Maryland VAMHCS, that the plaintiff be terminated from employment.

45. The plaintiff was terminated by defendant on July 9, 2004. The plaintiff filed a formal complaint of discrimination with the defendant on September 9, 2004. The agency issued a final agency decision on October 6, 2005 in which it denied plaintiff's complaints of discrimination and gave her notice of her right to file a civil action in the appropriate United States District Court.

## COUNT I

FAILURE TO REASONABLY ACCOMMODATE PLAINTIFF'S DISABILITY

46. Paragraphs 1 through 45 are incorporated herein by reference.

47. The plaintiff's multiple sclerosis substantially limits several of her major life activities, including her ability to walk and to drive. *Toyota Manufacturing v. Williams*, 534 U.S. 184 (2002). She is accordingly disabled.

48. The plaintiff was, at all times relevant hereto, qualified to perform the essential functions of the psychiatric nurse position for which she was hired with or without reasonable accommodation. As such, she was a qualified disabled person as defined by the ADA and the Rehabilitation Act.

49. By virtue of the plaintiff's notification to the defendant during the summer of 2003 that walking to and from her office at the Glen Burnie clinic was difficult, she requested reasonable accommodation pursuant to the ADA and the Rehabilitation Act.

50. By virtue of informing the defendant of her medical condition of multiple sclerosis, of her difficulty in driving long distances, of repeated walking in the Glen Burnie clinic, and of her fatigue resulting from the four hour round trip to Cambridge, the plaintiff notified the defendant of her status as a qualified individual who was requesting reasonable accommodation

pursuant to the ADA and the Rehabilitation Act.

51. By virtue of the defendant conditioning, under the purported authority of 5 C.F.R. § 339.104, the provision of reasonable accommodation to the plaintiff on her providing defendant with highly sensitive medical information that was unnecessary to the determination of her disability and her need for reasonable accommodation, the defendant failed to reasonably accommodate the plaintiff's disability.

52. By virtue of the defendant's refusal to reassign the plaintiff from the Cambridge facility or otherwise assist her with driving to that facility over a several month period; its refusal to arrange for her to be contacted at the Glenn Burnie facility when her patients arrived until after she contacted more than one layer of management; its failure to timely engage in the interactive process mandated by the EEOC regulations; and requiring the plaintiff to file a formal written request for accommodation; and then requiring her to provide unnecessary and irrelevant medical information before reasonably accommodating her disability, the defendant failed to reasonably accommodate Plaintiff's disability.

## COUNT II
## INTENTIONAL DISCRIMINATION AND HARASSMENT ON THE BASIS OF DISABILITY

53. Paragraphs 1 through 52 are incorporated herein by reference.

54. The ADA, 42 U.S.C. § 12112 and the Rehabilitation Act, 29 U.S.C. § 794 prohibit the defendant from discriminating against an employee "because of" solely by reason of her ...disability."

55. By virtue of the defendant conditioning, under the purported authority of 5 C.F.R.

§ 339.104, its reasonable accommodation to plaintiff on the condition of requiring the condition of requiring her to provide highly sensitive medical information that was unnecessary to either determination of her disability, her need for reasonable accommodation, or its obligation to accommodate her, the defendant discriminated against and harassed the plaintiff on the basis of her disability in violation of law and EEOC regulations as referenced in 5 C.F.R. § 339.103.

56. By selectively soliciting adverse comments from certain personnel regarding the plaintiff, by making various allegations against her, and by making it difficult for her to perform her duties, the defendant harassed the plaintiff on account of her disability in violation of law.

57. By virtue of recommending plaintiff for termination and terminating her despite the fact that she had maintained satisfactory performance, the defendant discriminated against her on account of her disability in violation of law.

III

DISCRIMINATION ON THE BASIS OF SEX

58. Paragraphs 1 through 57 are incorporated herein by reference.

59. Plaintiff is a female. Andrew Goldberger is a male. At all relevant times hereto, Mr. Goldberger and the plaintiff were psychiatric nurse practitioners performing the same or similar functions and duties at their assignments. Mr. Ron Hopper, who, at all relevant times, supervised Mr. Goldberger and Ms. Dank, is a male. Mr. Alan Etty also has a supervisory role over Mr. Goldberger and Ms. Dank, is also a male. At all relevant times hereto that the plaintiff was assigned to Cambridge, Maryland, Andrew Goldberger was assigned to a clinic at or near Baltimore.

60. By failing to switch the plaintiff's clinic assignments from Cambridge, a four-hour

round trip drive from VAMC Baltimore with that of Andrew Goldberger in Baltimore, the defendants discriminated against the plaintiff as a result of her sex.

## COUNT IV

### RETALIATION FOR SEEKING ACCOMMODATION UNDER THE REHABILITATION ACT AND ENGAGING IN STATUTORILY-PROTECTED ACTIVITY.

61. Paragraphs 1 through 60 are incorporated herein by reference.

62. As a result of the plaintiff seeking, and ultimately receiving, on or around March 23, 2004, reasonable accommodations for the symptoms of her multiple sclerosis, Ron Hopper, and other employees of the defendant mentioned heretofore, were inconvenienced. Ron Hopper and other employees, including various managers and supervisory personnel, developed an animus toward the plaintiff based upon her status as a qualified disabled individual under the ADA and Rehabilitation Act.

63. As a result of such animus, on March 31, 2004, a month after rating the plaintiff's performance as satisfactory and a week after the defendant notified the plaintiff that she would receive accommodation for her disability, Ron Hopper sought, and thereby initiated, the convening of a Summary Review Board of the NSPB to consider his recommendation that the plaintiff be terminated on the basis of her alleged poor interpersonal skills.

64. The Summary Review Board did not follow the defendant's internal governing regulations in carrying out its duties with regard to the plaintiff.

65. The Summary Review Board failed to make an impartial and independent investigation of Hopper's allegations and Plaintiff's performance.

66. As a result of its reliance on the representations of Mr. Hopper and other employees whose opinions were tainted by their animus toward the plaintiff for exercising her right to seek,

and, ultimately, receive accommodation for her disability, the Summary Review Board's recommendation for the termination of the plaintiff was tainted in violation of the ADA and the Rehabilitation Act.

67. As a result of the tainted recommendation of the Summary Review Board, the defendant wrongly terminated the plaintiff in violation of the ADA and the Rehabilitation Act.

## DAMAGES

68. Paragraphs 1 through 67 are incorporated herein by reference.

69. As a result of not being reasonably accommodated, of being discriminated against on the basis of her disability, and being retaliated against for seeking and ultimately gaining reasonable accommodation, the plaintiff has suffered damages in the form of physical deterioration of her medical condition and severe emotional and psychological distress.

70. As a result of being discriminated against because of her sex, the plaintiff has suffered damages in the form of her physical deterioration of her medical condition and severe emotional and psychological distress.

71. As a result of being wrongly terminated in violation of the ADA and the Rehabilitation Act and prior to finishing her probationary period, the plaintiff has suffered damages in the form of lost wages and benefits; damage to her reputation; serious physical deterioration of her medical condition; and severe emotional and psychological distress.

## RELIEF REQUESTED

Wherefore, Plaintiff requests the following relief:

a. a declaratory judgment that the defendant has violated the plaintiff's rights under the ADA and the Rehabilitation Acts and the Civil Rights Acts of 1964 and 1991;

      b. an injunction requiring the defendant:

          1) to reinstate the plaintiff with full back-pay and benefits to a position of psychiatric nurse practitioner at the grade, pay, and seniority commensurate with the grade, pay, and seniority she would have received had it not been for its unlawful discriminatory acts, and all vacation and sick leave that she would have accrued had the defendant not engaged in discriminatory acts;

          2) or, in the alternative, to provide the plaintiff with front-pay in an amount to be determined by the jury;

      c. compensatory damages for violations of the plaintiff's rights under the ADA and the Rehabilitation Act in the amount of $300,000 or such other amount as the jury may award;

      d. compensatory damages for violations of the plaintiff's rights under the Civil Rights Act of 1964 and 1991, 42 U.S.C. § 2000e-16(a) in the amount as the jury may award;

      e. punitive damages pursuant to 42 U.S.C. §1981a(2);

      f. an award of reasonable attorneys' fees and costs; and

      g. correction of her personnel file to remove the letter of termination and all related documentation reflecting the agency's actions against the plaintiff; and any other

      h. other appropriate relief as may be found just and equitable.

## JURY TRIAL

Plaintiff requests trial by jury on all her claims.

Respectfully submitted,

*[signature]*

Beth S. Slavet, D. C. Bar No. 305805
Jonathan Axelrod, D.C. Bar No. 210245
Anh-Viet Ly, D.C. Bar No. 485142
Beins, Axelrod, Gleason & Gibson, P.C.
1717 Massachusetts Ave., NW
Suite 704
Washington, DC 20036
(Ph)(202) 328-7222
Fax (202) 328-7030

Counsel for Plaintiff Bonnie Dank

I swear under the penalty of perjury that the above complaint is true and correct to the best of my knowledge and belief.

*[signature]*
Bonnie S. Dank

*[signature]*
Beth S. Slavet

December 22, 2005